UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12 CR 96 AGF / DDN |
| | ) | |
| BRANDON ADAMS, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND RECOMMENDATION

The pretrial motions of the parties were referred to the undersigned Magistrate Judge under 28 U.S.C. § 636(b). Before the court are the motions of defendant Brandon Adams (a) generally to suppress arguably suppressible evidence (Doc. 8, oral motion), (b) to suppress physical evidence (Doc. 41); and (c) to suppress statements (Doc. 42); and of the United States for a determination of the admissibility of arguably suppressible evidence (Doc. 9, oral motion). A pretrial evidentiary hearing was held on November 2 and 5, 2012.

From the evidence adduced during the pretrial evidentiary hearing, the undersigned makes the following findings of fact and conclusions of law:

## FACTS

### Before May 3, 2011

1. On July 22 and August 16, 2010, and again in early 2011, law enforcement, including Police Officer Neal Rolfing, of the Fairview Heights, Illinois, Police Department, detached to the Drug Enforcement Administration as a Task Force Officer (TFO), received Crimestoppers hotline telephone tips about illegal drugs being sent to Custom Sounds, a retail audio appliance business at 3550 N. Illinois, in Fairview Heights. The tips stated that the shipments were in boxes measuring 2 feet on each side and having black stripes, that the boxes might be sent by "Next Day Air" service, and that there were guns and drugs in the Dellwood, Missouri, residence of Brandon Adams, who was connected with Custom Sounds. The tips also stated that a woman owned the residence.

In the last tip contact, the tipper asked whether the police had yet made any arrest.

## May 3, 2011

2.    a.    On May 3, 2011, TFO Rolfing, following up on the Crimestoppers hotline tips, phoned UPS Security Supervisor Mike Reitinger[1] and, in a conversation that lasted about 30 minutes, told him about the tips and the information they provided, including drug trafficking involving the Custom Sounds business in Fairview Heights. Rolfing told Reitinger what the tips said about the size of the boxes and the possible use of "Next Day Air" service. Rolfing told Reitinger that he would like to know about any box UPS received for delivery to Custom Sounds. If such a box was located, Rolfing intended to use a narcotics trained dog to sniff it.

b.    From his experience, Reitinger knew that a law enforcement investigative controlled delivery of a drug parcel might be made to Custom Sounds. Reitinger checked the UPS computer for past deliveries to Custom Sounds and saw that many packages were delivered there, but only a few used the "Next Day Air" service. This fact heightened his interest in such a delivery to Custom Sounds.

---

[1]Reitinger had been with UPS since 1983. As part of his employment as a UPS security supervisor, Reitinger had become familiar with audits, claims, credit card fraud, and drug shipments. When investigating a putative drug shipment, UPS's protocol required UPS personnel to contact the police and to cooperate with law enforcement. If law enforcement asked what was in a particular parcel, Reitinger would open it. Otherwise, he knew that for law enforcement to open a sealed package at a UPS facility, a search warrant or "seizure document" of some kind would have to be obtained. In this case, Reitinger's suspicion about the box was based upon the law enforcement interest in it and Custom Sounds being involved in drug law violation. In this case, also, no one in law enforcement specifically asked him either to open any parcel or not to open it, if one was identified that fit the characteristics given him.

3.    a.    Reitinger passed on this information to Craig Walters, the UPS Preload Supervisor[2] who was responsible for the area that included Customs Sounds.  He told Walters to be on the lookout for a package addressed to the Custom Sounds address likely with UPS's Next Day Air service.

b.    Walters in turn notified his UPS clerks to be on the lookout for such a parcel.  Walters received such alerts from law enforcement two or three times a month.  He understood that his decision whether or not to open a package depended on UPS policy and his discretion.

<u>UPS opening of box</u>

4.    a.    On May 5, 2011, a UPS clerk spotted a box addressed to Custom Sounds and brought it to Supervisor Walters.  Walters held onto the box for approximately one hour, until it was time for the UPS delivery truck drivers to begin their deliveries.  Without having heard from law enforcement, Walters decided to open the package and did so, without any direction either from UPS or from law enforcement.

b.    Inside the box, he found smaller packages, each about one foot in length.  Walters could not determine what was inside the smaller packages, but he thought they looked similar to packages of narcotics he had seen in the past.  He kept the box and its smaller packages for law enforcement.

5.    Walters took and opened the box because of the law enforcement interest in such packages going to Custom Sounds.  In his UPS employment, Walters had to decide whether to place the package on a delivery truck or not to do so and to keep it for law enforcement.  If the box's contents looked innocent to him, such as being stereo equipment for Custom Sounds, he would have it put on a truck for delivery.  Because of law enforcement interest in both Custom Sounds and such a package delivery and because the contents of the package looked somewhat similar

_____

[2]The Preload Supervisor was responsible for being sure that parcels coming into the UPS hub were timely loaded on the trucks for the next stage of the delivery process.

to drug packages he had seen in the past, he kept the box and the packages inside it.

6. After Walters opened the box and saw the packages, he phoned Reitinger and told him he had opened the box. When asked what was inside the package, Walters said that he did not know, but that the contents of the box did not look good, like stereo equipment which would be expected for Custom Sounds, but looked similar to drug packages he had seen. Reitinger told him he would notify law enforcement.

### TFO Rolfing takes custody of the box and its contents

7. a. Shortly after Walters opened the box and phoned him, UPS Security Supervisor Reitinger phoned TFO Rolfing. He told Rolfing that a UPS manager in Belleville, Walters, had found a suspicious box, had opened it, and saw that it contained more suspicious packages. Rolfing was told Walters thought the packages contained marijuana but that he was not sure.

b. TFO Rolfing and Police Officer Hinson drove to Belleville and took custody of the box and the packages inside it. When Rolfing saw the smaller packages, which he saw were wrapped in bubblewrap, from his experience he believed they looked like they contained marijuana, even though they had no smell. These smaller packages were dark and Rolfing could not see through the wrapping. Rolfing did not believe he had probable cause for a warrant to originally open the box and search it. but now, with the box opened, he wanted to determine whether the packages contained drugs and he decided to use a trained narcotics dog for this purpose.

8. a. TFO Rolfing took the box and its contents to the Illinois State Police office. A narcotics canine unit was dispatched there and sniffed the package. The dog showed some interest in it, but not sufficient interest for its handler to believe the dog alerted for the presence of drugs. The package had no distinctive aroma. Nevertheless, TFO Rolfing believed the package contained marijuana, because of the tips, the visual appearance of the smaller interior packages, and the inconsistency of the inside packages with the types of stereo products

known to be sold at Custom Sounds.  At the police office, a field test of the contents of at least one of the packages was conducted and the results indicated that the contents were cannabis.  <u>See</u> Gov. Ex. 1 at 3. No warrant or judicial order was obtained to authorize the field test.

        b.    The investigators rewrapped the box with only a portion of the marijuana inside, and included in the box an electronic alarm device that sounded when the box was opened.

        c.    Some officers then went to apply for an Illinois state court anticipatory search warrant for a controlled delivery of the package to Custom Sounds.

        d.    Other officers, including TFO Rolfing and Illinois State Police Officer Karen Goren, went to the Dellwood, Missouri, residence that the Crimestoppers tips indicated belonged to Brandon Adams, to secure the residence in anticipation of a later entry by warrant or by consent.

<u>Anticipatory search warrant</u>

9.    a.    Thereafter, on May 5, law enforcement applied to the Circuit Court of St. Clair County, Illinois, for an anticipatory search warrant for the Custom Sounds premises.

        b.    In support of the application for the warrant, Metropolitan Enforcement Group of Southwestern Illinois Special Agent Josh Hubbard submitted his written, sworn statement to the court in the form of a "Complaint for Anticipatory Search Warrant," Government Exhibit 1.  In the complaint, Agent Hubbard described the Custom Sounds premises at 5350 N. Illinois in Fairview Heights.  The complaint sought authority to search the premises and seize several categories of items:  cannabis in any form; literature involving trafficking in cannabis; paraphernalia and physical equipment and tools for trafficking in cannabis; business and financial records and documents related to cannabis trafficking; digital communications equipment; computers and related devices and equipment; maps and travel related documents; US currency, precious metals, and other valuable items and financial instruments; safes and lockboxes which could contain cannabis and cannabis related items;

indicia of occupancy and ownership of the premises to be searched; and photographs and video records of people involved in cannabis trafficking.

c.    Officer Hubbard's complaint also described the factual basis for finding probable cause to issue the warrant.  The document described his 9-year law enforcement experience.  Further, the document described relevant events of May 5, 2011.  In the morning of May 5 he was notified by DEA Task Force Officer Rolfing about "a suspicious package located at the UPS hub" facility in Belleville, Illinois.  UPS Loss Prevention Manager Craig Walters told Rolfing that "he located a suspicious package being shipped through his facility and believed it contained drugs.  The complaint stated that Mr. Walters opened the package and discovered three vacuumed sealed bags of cannabis.  TFO Rolfing transported the package from the UPS hub to a law enforcement office where Officer Hubbard obtained the package.

d.    The complaint document described the package as a brown box, approximately 14 inches long on each side, "taped with clear tape." The package's tracking number was stated, along with the identities of the shipper, Charles Scott at 4435 N.1st St., Livermore, California 94551, and the intended recipient, "ATTN: James, Custom Sounds 5350 N. Illinois Fairview Heights, IL 62208."  The complaint further stated that "[t]he cannabis was weighed at approximately 1568 grams and field tested positive for cannabis." Gov. Ex. 1 at 3.  The complaint stated that, in anticipation of the anticipatory search warrant, the officers reconstituted the package with approximately 654 grams of cannabis, the remaining being secured for evidentiary purposes.

e.    Officer Hubbard's complaint described the intended use of the warrant.  A controlled delivery of the package would be made to Custom Sounds on May 5.  The package will also contain an electronic device that issues an alarm to indicate the package has been opened. When this alarm is received, law enforcement will execute the subject anticipatory search warrant.  If the alarm has not sounded within a reasonable amount of time, the agents will execute the warrant solely to retrieve the package.

f.    Based upon this complaint, Illinois Circuit Judge McGlynn issued the requested warrant.

### Controlled delivery and arrests at Custom Sounds

10.    Thereafter, at 2:06 p.m., a controlled delivery of the box was made at Custom Sounds.  Before the search was executed, the officers were instructed that, if the proprietor was present at the business, the officers were to try to get consent for a search of his residence; otherwise, a search warrant for the proprietor's residence would be sought.  An officer dressed in a UPS uniform brought the package to the Custom Sounds establishment.  The package was accepted by Custom Sounds and, after it was inside the premises for a short time, at about 2:07 p.m., the officers heard the package alarm go off.  At that time, officers entered the business premises and found the package in a back room.  The officers, including Officer Karen Goren, encountered four Custom Sounds personnel, including Brandon Adams.  All four were questioned and photographed.  At about 4:26 p.m., three of the four, including Adams and a man named Harrison were arrested.  Brandon Adams was identified as the proprietor of the business premises.  The fourth individual was released.

11.    Mr. Harrison, after being advised of his <u>Miranda</u> rights, gave information relating only to Adams.

### Search of Adams' car on Custom Sounds parking lot

12.    In connection with the controlled delivery and entry into Custom Sounds, Canine Unit Officer Cook and his narcotics trained dog Mele were dispatched there to investigate for the presence of drugs.  Mele sniffed the business premises but did not alert for the presence of drugs.  In the Custom Sounds outdoor parking lot, Mele sniffed around the outsides of the four vehicles present.  Mele positively alerted to the driver's side of a black Saturn auto.  One of Adams's co-workers identified the Saturn as belonging to Adams.  The auto was searched without a warrant and from inside it the police found and seized a quantity of marijuana and a pipe.

<u>Adams' statement at Custom Sounds</u>

13.  After Brandon Adams was placed under arrest, he was orally advised of his constitutional rights to remain silent and to counsel. Adams said he would speak with the officers.

<u>Police at residence before anticipatory search warrant issued</u>

14.  At approximately 3:30 p.m., investigators and officers, including TFO Rolfing and Officer Goren, went to the residence on Tanner in Dellwood, Missouri, anticipating further investigative activities there.  Their purpose was to secure the residence to prevent the possible removal of evidence.

15.  Because the presence of the plain clothes police at the residence drew the attention of neighbors and because it is common for a law enforcement agency from another jurisdiction to contact the local police out of courtesy, TFO Rolfing contacted the Dellwood Police Department.  Two Dellwood officers, Det. Joseph Hollocher and Sgt. Paul Harris, were dispatched to meet with "federal agents" at a nearby fast food restaurant.  Hollocher wore plain clothes and Harris was in uniform, ultimately the only uniformed officer at the residence.  At about 3:40 p.m. they arrived and met task force officers, including Rolfing and Goren, at the restaurant.  Rolfing and Goren explained that they were involved in a drug investigation and wanted to see if anyone else was present at the residence.  Then, all went to the residence.

16.  a.  By the time they arrived at the residence, the officers learned that Brandon Adams was cooperating with law enforcement.  <u>See</u> Findings 18 and 19, below.  Rolfing, Goren, and the Dellwood officers went to the front door of the residence and knocked. They heard dogs barking.  When no one answered the front door, out of concerns for officer safety, Hollacher and Harris were directed to walk around to the back of the residence.  They did so and found an attached garage located adjacent to the residence's backyard.  The door into the garage was partly open.

b.     Hollacher and Harris entered the garage through the open door out of concern for officer safety to be sure no one was inside it.[3] Inside the garage the officers saw a car and a motorcycle. They saw that a door through a common wall led from the garage into the residence. They determined that there was no one in the garage. Whether or not either of these officers knocked on the door between the garage and the residence, the officers could hear one or more dogs barking, but no other sound from inside the residence and no officer entered from the garage into the residence.[4] Instead, after having cleared the garage for officer security purposes, they returned to the front of the residence and told TFO Rolfing that they had "cleared" the garage.

17.     a.     At about 4:30 p.m. the home security system at the Dellwood residence registered an intrusion alarm.   The record of the alarm company stated that after the alarm sounded, several calls were made to contact numbers, but the alarm company could not reach any contact individual. The alarm company's record also indicated that, at approximately 4:34 p.m., the alarm company phoned the Ferguson Police Department and requested officers be dispatched to the residence. The record indicates that the Ferguson Police Dept. advised the alarm company that officers were already on the scene and stated that the officers had set the alarm. See Def. Ex. A.

b.     The Crimestoppers' tips also had provided the name of the owner of the Dellwood residence and her telephone number. With this information, Officer Goren attempted to phone her several times to ask for her consent to search the residence. Goren was never able to speak

---

[3]When they entered the garage, they did so without a warrant and without seeing any illegal act, without having seen anyone else related to the residence, and without seeing any contraband. They nevertheless were concerned for the safety of the officers present who were conducting an investigation that involved drugs and guns.

[4]At one point during his hearing testimony, Officer Hollacher testified that only he and Officer Harris entered the "residence." From the content and context of Hollacher's testimony, the undersigned believes Hollacher misstated "residence" and intended to say "garage." The undersigned credits his testimony that only he and Officer Harris entered the garage.

with her.  However, her lawyer spoke with Officer Goren and told her that his client was not involved with the Tanner residence anymore.  No contact was made with the woman.

### Adams interviewed at Fairview Heights police station

18.    a.    After the arrest at Custom Sounds, the officers took Adams to the Fairview Heights Police Department.  Officers Bullard and Boothe interviewed Adams in an interview room at the police station.[5]  The interview began at 4:17 p.m. and ended at 5:20 p.m.

b.    Before Adams was advised of his constitutional rights to remain silent and to counsel, for about ten minutes Officer Bullard asked Adams for background biographical information.  Adams said he had graduated from high school and attended Florissant Valley Community College for two years, but did not receive an associate's degree.  Adams said that he lives with his mother, that he had been previously arrested and placed on probation for having one pound of marijuana, and that he had received two months of inpatient drug treatment while on probation.  He also stated that he had not been previously interviewed about that day's incident.

19.    a.    At approximately 4:26 p.m. Adams was read his constitutional rights to remain silent and to counsel and waived these rights, orally and in writing.  Gov. Ex. 2.  The officers did not make any promise or coerce Adams into waiving his rights to counsel and to remain silent.[6]  Thereafter, mostly Officer Bullard and occasionally

---

[5]The undersigned makes the findings of fact regarding the interview of Brandon Adams at the Fairview Heights, Illinois, police station, based upon the hearing evidence, including reviewing the live recording of the interview, received into evidence as Government Exhibit 3.

[6]As found below, Adams had legal counsel available to him.  This fact was first made known to the interviewing officers near the end of the interview.  At no time during the interview did Adams in any fashion indicate that he did not want to be interviewed any more or indicate that he wanted the services of legal counsel.  Rather, he answered the officers' questions and engaged them in conversation in an effort to reduce or limit his criminal liability and to avoid the officers forcibly entering the residence.

Officer Boothe asked Adams questions which he answered.  For most of the next hour, the officers and Adams discussed whether Adams would cooperate, provide the officers information, and consent to a search of the Dellwood residence.

b.    During the interview, Officer Boothe asked Adams to cooperate by calling his girlfriend and having her consent to the officers entering and searching the residence.  When Adams asked why this was important, Officer Boothe told Adams that the police believed there is drug activity going on at this house and that she is storing drugs and drug money there.   Boothe told Adams that the police had valuable information from several sources that Adams was getting packages.  Adams stated that he was being charged with a felony amount of marijuana, referring to the marijuana in the UPS box.

c.    At approximately 4:35 p.m., the officers told him that there were officers then waiting outside his girlfriend's house.  Adams, now anxious about facing charges in both Illinois and Missouri, stated "If there's something else over there, I am getting charged there too.  Oh, my God, man, damn oh damn."  Officer Hubbard asked Adams whether there was a million dollars in his "old lady's house" with marijuana residue on it.   The officer then told Adams that the police found marijuana in the car a co-worker saw him drive up in that day.

d.    During this exchange, at approximately 4:45 p.m., Adams asked, "So, I can't get no phone call now, except for her?"  Officer Boothe answered in the affirmative.

e.    Officer Hubbard told Adams that his supervisors were "pressing" him for information on whether Adams would cooperate and consent to a search of the residence.  Boothe told Adams that he could make one call, to his girlfriend.  When he told the officers that he did not know what the charges were against him, Officer Hubbard replied that he was being charged with the marijuana right now.

f.    Officer Boothe then told Adams, "Your cooperation is going to help you out a lot in this deal.  If you go the hard road, they've got enough to get the search warrant.  That's why they keep calling.  They want to know what you want to do."  Boothe then reminded

Adams of the presence of a dog in the residence, which the officers might have to shoot when they enter forcibly with a warrant.  The officer told Adams that the officers did not want to end up seizing all of his property.  "We are trying to go the easy route. . . .  You probably have a probation case anyway.  I'd almost bet you're going to get probation over here," referring to the current investigation in Illinois.  Adams acknowledged, "That's over here."

g.    Again, Officer Boothe stated to Adams that the police did not know what criminal activity Adams was involved with in the Missouri residence, that there were police officers waiting outside that residence, "just sitting there," and that Adams had to decide whether he would cooperate and allow the entry of the police into the residence or not cooperate and have the police enter with force, possibly shoot the dog, and seize Adams' property.

h.    Shortly before 4:55 p.m. Officer Boothe told Adams that the police are going to enter the residence with or without his cooperation, and that if he cooperated, the police would pass that fact on to the authorities, including the officers involved with seeking the forfeiture of property purchased with drug money.

i.    At about 4:55 p.m., Officer Boothe told Adams, "That's the way it is, bro.  You pay to play."  Adams said, "Let me smoke, man. I'll let you in there.  I'm going to let you in there."  After a bit of silence, Adams told the officers that inside the residence were 5 ounces of marijuana, an AR-15 rifle, a Glock handgun that was his mother's, and a revolver.  He told the officers that his girlfriend is probably not there.  Officer Hubbard then asked Adams about the California source of the marijuana.  He told Adams that the police knew he had received parcels from California in the past, and that Adams should "understand that I can't charge you with the other weed from California."  Adams told the officers about legalization of marijuana, that he does not get involved with heroin, but that "everybody here smokes weed."  Adams told the officers he did not want them to kick the door open and the other consequences of forcible entry.  Officer Boothe said, "That's probably what would have ended up happening."

j.    Next, Adams attempted to contact his girlfriend by voice phone call, then by texting her, both without success.  Officer Boothe again stated, "We don't want to break the door down," and Adams replied, "I'll let you in."

k.    Officer Hubbard asked Adams whether he had his keys. Adams replied that his keys were at the Custom Sounds shop.

l.    At approximately 5:12 p.m., Adams asked the officers whether they would seize only the marijuana at the residence.  Hubbard told Adams that the police had to seize the firearms also, to see whether any of them had been involved in any shooting.

m.    Next, Officer Hubbard suggested that he take Adams to smoke a cigarette.  Adams said, "I do have a bad ass lawyer."  Officer Hubbard said, "Your girlfriend apparently called the lawyer to say, 'Hey what's the deal?,' and the lawyer told your girlfriend what we had already talked about and we are not trying to get her to end up with anything--the same thing we told you."  Adams again expressed his desire that the prosecution be limited to the Illinois activity, "I would love to keep this over here.  That's my worry and the fucking guns are my worry."

n.    At approximately 5:15 p.m., as the officer and Adams were leaving the interview room to give him an opportunity to smoke a cigarette, Adams said, "We got a good rapport.  I ain't doing nothing to fuck it up."[7]

o.    At approximately 5:19 p.m., the officer and Adams returned to the interview room.  Adams affirmed the officer's statements that during that smoking interlude he was asked no questions, no promises

---

[7]During the evidentiary hearing, defendant Adams testified that during the unrecorded break in the interview, while he was smoking a cigarette away from the interview room, both Officer Bullard and Officer Boothe told him, "You might as well let us in.  We have already been in." The undersigned does not credit Adams's testimony in this regard, because by this time he had already agreed several times to allowing the officers to search the residence.  There was no purpose for the officers to make this statement and the undersigned has found as a fact that no officer had entered the residence.

were made to him, and all that occurred was that he was allowed to smoke a cigarette as he had requested.

　　　　p.　　At approximately 5:20 p.m., the interview ended with Adams telling the officers that his new co-worker at Custom Sounds had nothing to do with any criminal activity. Gov. Ex. 3.

　　20.　a.　　Next, Task Force Officers Bullard and Boothe drove Brandon Adams back to Custom Sounds where Adams obtained his keys, including the key to the residence on Tanner in Dellwood, Missouri.

　　　　b.　　From there the officers drove Adams to the parking lot of the Casino Queen casino nearby in Illinois, arriving at 6:22 p.m.[8] The purpose for going to the Casino Queen area was to have evidence that the police had released Adams from custody, so that if he continued to consent and allow a search of the residence, the consent would be voluntary.

　　　　c.　　In the casino parking lot, Adams sat in the front passenger seat of the police car. At that time it was daylight and raining lightly. Eight minutes later, at 6:30 p.m., on the audio-video record, Officer Bullard stated to Adams, and Adams affirmatively stated his agreement, that in the eight minutes before the recording device was turned on, they all discussed whether Adams would take them to the residence on Tanner, that the handcuffs and shackles had been removed from him, and that Adams is released from custody and free to do what he wanted to do "right now." Adams stated expressly that he has agreed to take the officers to the residence on Tanner where he will let the officers into the residence "voluntarily." Adams affirmed that the officers had not threatened him ("not at all"). Officer Bullard stated he had previously read Adams "his rights" and that he can do so again. Adams's demeanor indicated he wanted to cooperate in the investigation. Adams remained in the police vehicle. At 6:31 p.m. the audio-video

--------

　　　　[8]The record supporting the findings made by the undersigned about what happened at the Casino Queen include the evidence received during the evidentiary hearing and the review by the undersigned of the audio-video recording of the interior of the police vehicle at the Casino Queen at this time, Government Exhibit 5.

equipment was turned off and the officers drove Adams to the Dellwood residence.

## Adams taken to residence in Dellwood

21.	a.	Before Adams arrived at the residence, the officers contacted TFO Rolfing at the residence.  They told him that Adams was cooperating and that they were bringing him to the residence.  They expected he would consent to a search of the residence.  Before Adams arrived, other than the quick security search of the garage, no law enforcement officer had entered the residence.

b.	At 6:54 p.m., the police car with Adams and the officers arrived at the residence at 10440 Tanner in Dellwood, Missouri.    In the video recording made at that time, Adams affirmed Officer Hubbard's statements that Adams rode voluntarily with the officers to the Dellwood residence, that Adams was free to go, and that he voluntarily, without any coercion, agreed to let the officers into the house for a consent search.  Adams then said, "So I'm walking in and they go through all my shit?"  Officer Hubbard responded, "You can stand right there with them. . . . What we can do, if you prefer is . . . ."  Adams stated, "I don't want Dellwood in there."  Officer Hubbard said, "Well, we can leave him out here."  Adams said, "I want you all to walk out of there with a bag."  Officer Hubbard said, "What we'll do is you just walk us around the house."  Adams grunted "Uh-huh" indicating his agreement.  Hubbard said, "Now understand this, since you said there's guns in the house . . ."  Adams said, "Yeh. I'll tell you exactly where they are."  Hubbard stated, "Don't reach for . . . ."  Adams said, "I'm not reaching for anything."  Adams agreed that he would just point to where a gun was located.  Adams again stated that he did not want the Dellwood police to be inside the residence ("I don't want to see him.").  See Gov. Ex.  5.

## Entry into the residence

22.	Next, Adams and the officers walked to the rear of the residence, where they entered the garage.  In the garage, Adams walked up to the door that led into the residence, used a key to easily open the

door. The door opened easily upon Adams inserting his key into the lock and easily twisting it.  This door and the door frame bore no marks or other appearance of a prior forced entry into the residence and no one remarked that such had happened.  The officers videotaped Adams entry into the residence from the garage and they videotaped the search of the residence.  Gov. Ex. 5.

23.   Before they entered the residence, Adams and Officer Hubbard agreed that Adams would settle the dogs.  Adams walked through the door first, into the kitchen and bent over to tend to one or more dogs. Before he entered, Officer Bullard stated to other officers that Adams "would like for Dellwood to stay out."  Adams asked, "They already been in?"  As Adams said this, a beeping sound could be heard, which Adams turned to his left and turned off.  Bullard responded, "No, I told them No."

24.   As soon as Adams was in the kitchen, a short but loud piercing high tone sounded.  Adams immediately walked to a location by the door they had entered and turned off the alarm sound.

25.   In the kitchen, Adams turned to his right and bent over to attend to a dog.  At that time another high pitched alarm-type sound was heard.  Adams quickly walked back to his left and turned off the sound. After he turned off the sound, Adams pointed out marijuana in a black bag on the kitchen table, "Here's the bag with the weed in it."[9]  Again, Adams asked about the presence of any Dellwood officer and Officer Hubbard stated that he had asked them to stay out.  In the living room, Adams indicated something to seize near an ottoman.  In a box on the coffee table, Adams pointed out a pistol.  As they walked through the residence, Adams and Officer Hubbard conversed.  In a bedroom, Adams opened a night table drawer by the bed and showed the officers a Glock pistol and its

---

[9]During the evidentiary hearing, Adams testified that this marijuana had been stored elsewhere.  The undersigned does not credit this testimony, which would indicate that an officer had previously been inside the residence and moved the marijuana into the open.  The video record of the search does not indicate in any way that Adams was surprised to see the marijuana on the table or expected it would be found elsewhere.

accessories.[10]  In the bedroom closet, Adams pointed out the AK-15 rifle.
In response to Hubbard's question about whether there was any more
marijuana or firearms, Adams briefly hesitated and then said, "Yes" and
led the officer to another room where he pointed out more marijuana.
Hubbard saw a safe in a closet and asked Adams whether there were any
guns or marijuana inside.  Adams said No.  Hubbard asked Adams if he
minded opening the safe and Adams said he had no trouble doing so and
opened the safe.  Its interior was videotaped; only documents were seen--
no guns or marijuana.  Hubbard asked Adams whether there was anything
else to be pointed out and seized and Adams said No.  Hubbard then said,
"Let's go do a property receipt."  The officers secured the seized items.
The video recording ended at 7:04 p.m.  <u>See</u> Gov. Ex. 5.

26.  After the residence was searched, the officers left the
residence, leaving Adams there.

<u>After May 5</u>

27.  Several days after May 5, 2011, TFO Rolfing and another
officer met with Adams in a restaurant near the St. Louis airport.  At
this time Rolfing again orally advised Adams of his constitutional rights
to remain silent and to counsel, which Adams understood.  At that time,
Adams told the officer that he would not identify his drug source.  When
asked about his Chevrolet Camero, Adams said he had paid cash for it.
At no time on that day was Adams in custody.  That was the end of any
cooperation by Brandon Adams.

**<u>DISCUSSION</u>**

Defendant Adams has moved to suppress as evidence against him the
physical evidence seized by the government on May 5, 2011, and the
statements he made to law enforcement that day.  (Docs. 41, 42.)

---

[10]As Adams accompanied the officers through the residence, he had
his hands half up in the air, to avoid the officers suspecting he might
reach for a weapon.

## The box and its contents

Defendant challenges the search of the box by UPS on May 5, 2011. He argues that when UPS supervisor Walters opened the box, UPS acted as the agent of the government and did so without a warrant or justified by any exigent circumstance, in violation of the Fourth Amendment.

The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. This limitation on searches and seizures applies to government action. It is not a limitation on the acts of a private, non-governmental party. Burdeau v. McDowell, 256 U.S. 465, 474–75 (1921); see also, Walter v. United States, 447 U.S. 649, 656–57 (1980); United States v. Tapia, 481 Fed. Appx. 288, 289 (8th Cir. 2012). However, the limitations of the Fourth Amendment apply to a search or seizure by a private party when acting as an agent of the government. United States v. Parker, 32 F.3d 395, 398–99 (8th Cir. 1994).

Whether UPS supervisor Walters acted as the agent of the investigating officers, as defendant argues, "depends on the degree of the [officers'] participation in [UPS's] activities." Id. More specifically, the Eighth Circuit Court of Appeals stated: "Two critical factors in assessing whether a private party acts as an agent of the government are (1) the government's knowledge of and acquiescence in the search, and (2) the intent of the party performing the search." Id. at 398. The Eighth Circuit cited Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 614 (1989), for the proposition "the fact that the government does not compel the private party to search does not establish that the search is private for purposes of the Fourth Amendment." Id.

In the case at bar, the interest in the box opened by Walters was initiated by Officer Rolfing, not UPS. Other similar packages had been delivered to Custom Sounds by UPS without suspicion and without law enforcement interest. The repeated Crimestopper tips with specific information about packages to Custom Sounds, the nature of the criminal

activity, and the involvement of the Dellwood residence would have provided law enforcement a basis for temporarily detaining the subject box unopened for further investigation. <u>See</u> <u>United States v. Smith</u>, 383 F.3d 700, 704 (8th Cir. 2004)(citing <u>Terry v. Ohio</u>, 392 U.S. 1 (1968)).

In <u>Smith</u>, the Court of Appeals restated factors relevant to deciding whether or not the private party acted as an agent for the government:

> whether or not the government had knowledge of and acquiesced in the intrusive conduct; whether the citizen intended to assist law enforcement agents or instead acted to further his own purposes; and whether the citizen acted at the government's request.

383 F.3d at 705; <u>cf.</u>, <u>United States v. Muhlenbruch</u>, 634 F.3d 987, 998 (8th Cir. 2011)(same).

The Court of Appeals found whether the private party acted as a government agent was a close issue in <u>Smith</u> because the government knew of and acquiesced in the opening of the package. However, further considering that there was no evidence that the private party felt she was obligated to open the package and the fact that the law enforcement officer had told the private party that the decision to open the package was her's alone, the court concluded that the private party was not a government agent for Fourth Amendment purposes. 383 F.3d at 705.

When considering further the intent of the private party in <u>Smith</u>, the Court of Appeals considered the private party's dual motivation, both to assist the law enforcement officers and to not let her employer be used as a means for transporting contraband. The court held that the motivation to aid law enforcement did not by itself make the private party a government agent. <u>Id.</u> The court affirmed the district court's denial of the motions to suppress, stating "[g]iven the absence of evidence that [the private party] was motivated solely or even primarily by the intent to aid the officers, we conclude that the district court's factual finding that she opened the package out of her desire to ensure that her company was not being used as a vehicle in the drug trade was not clearly erroneous." <u>Id.</u> at 705-06.

Supervisor Walters opened the box because he knew of the law enforcement interest in and suspicion about it. He was not told to open the box by anyone, UPS or law enforcement. Like the UPS employee in

<u>Smith</u>, Walters opened it to prevent the UPS system from being used to ship drugs.  Walters was not acting as an agent of the government when he did so.

Generally, the government is limited by the Fourth Amendment when opening sealed packages deposited in the mail, <u>Ex Parte Jackson</u>, 96 U.S. 727, 733 (1877), or packages otherwise committed to a private company like UPS for shipment, <u>Walter v. United States</u>, 447 U.S. at 655-56.  When Walters opened the box and saw the smaller wrapped packages, he in effect conducted a warrantless search that would have violated Fourth Amendment standards had it been done by the government.  <u>United States v. LaLerie</u>, 424 F.3d 694, 707-08 (8th Cir. 2009)(en banc).  He did not have sufficient information about the box to establish probable cause for a search of it, i.e., reason enough to cause a reasonable person to believe evidence of criminal activity was present in the closed box.  <u>Illinois v. Gates</u>, 462 U.S. 213, 232 (1983); <u>United States v. Mayo</u>, 627 F.3d 709, 713 (8th Cir. 2010).

When Walters gave the opened box to TFO Rolfing, with the interior packages exposed, the Fourth Amendment limited the government from conducting a search that exceeded the scope of Walter's private search without a warrant issued on probable cause, or without consent or any other recognized exception to the warrant requirement.  <u>Walter v. United States</u>, 447 U.S. at 657-58.

After TFO Rolfing received the opened box and saw the several smaller packages inside the box, he did not have probable cause to believe the smaller packages contained marijuana or "cannabis," in the language of the complaint filed in support of the anticipatory search warrant.  What UPS's Walters and TFO Rolfing knew was that the smaller packages had no aroma and what was inside them could not be seen discerned visually.  So, lawfully under the Fourth Amendment Rolfing had the material sniffed by a trained narcotics dog.  However, the dog did not alert sufficiently to indicate that the packages contained marijuana.

Next, without a warrant the officers conducted a field test of the contents of one or more of the smaller packages and the contents tested positive for marijuana.  The conduct of the field test was not a search under the Fourth Amendment.  <u>United States v. Jacobsen</u> 466 U.S. 109,

(1984).  Thus, the precise contraband nature of the material in the packages was lawfully learned by the investigators.

The information learned from the field testing of the smaller packages in the box was a linchpin in the sworn complaint document that supported the issuance of the anticipatory search warrant.  The execution of the warrant and the seizure of the delivered contraband inside Custom Sounds led to the lawful, warrantless arrest of defendant.[11]  The information the police had by that time would cause a reasonable person to believe Adams was involved in possessing marijuana.  Beck v. Ohio, 379 U.S. 89, 91 (1964)  United States v. Nevils, 897 F.2d 300, 309 (8th Cir.), cert. denied, 498 U.S. 844 (1990) (probable cause can be found in the information set forth in a search warrant affidavit).

Defendant argues that his statements and his consent to the officers searching the residence were not voluntary.  The undersigned disagrees.

The government has the burden of establishing the constitutional admissibility of a defendant's statements by a preponderance of the evidence.  Colorado v. Connelly, 479 U.S. 157, 169 (1986).  The admissibility of a defendant's statements depends upon whether the statements are constitutionally voluntary, id.; and, when the statements are made during police interrogation while the defendant was in custody, whether the defendant had been advised of his rights, as prescribed by Miranda v. Arizona, 384 U.S. 436 (1966), and, if so, whether the defendant knowingly and voluntarily waived the Miranda rights, North Carolina v. Butler, 441 U.S. 369, 373, 375-76 (1979).

In this case, the record is clear that defendant was orally and in writing advised of his Miranda rights.[12]  Thereafter, to further his own

---

[11]Furthermore, the warrantless seizure of the marijuana from defendant's Saturn on the parking lot outside the Custom Sounds premises following the positive dog sniff was lawful and also supported his warrantless arrest.  United States v. Engler, 521 F.3d 965, 971 (8th Cir. 2008).

[12]At the police station on May 5, 2011, before he was advised of his Miranda rights, he was asked for basic biographical information.  These statements should not be suppressed.  Routine biographical information is not covered by the requirements of Miranda.  Pennsylvania v. Muniz, 496 U.S. 582, 601-02 (1990).

interests in limiting his criminal liability and in preventing a forced entry into the residence, he expressly waived his rights to remain silent and to counsel and engaged in dialog with the officer and answered their questions.

The undersigned also concludes that defendant's statements and his consent to the search of Dellwood residence were voluntary. Statements are constitutionally involuntary if they are the result of government overreaching, such as physical mental or physical coercion, deception, or intimidation. <u>Colorado v. Connelly</u>, 479 U.S. at 169-70; <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). While some of the officers' questions and comments were designed to press him toward consenting to the search, in the context of all of his statements at the police station, in the officers' vehicle, and at the residence, the interrogation never overbore his ability to not cooperate and to remain silent.

For these reasons,

**IT IS HEREBY RECOMMENDED** that the motions of defendant Brandon Adams to suppress evidence (Docs. 8, 41, 42) be denied.

**IT IS HEREBY ORDERED** that the motion of the United States for a determination of the admissibility of arguably suppressible evidence (Doc. 9) be denied as moot.

The parties have 14 days in which to file written objections to this Order and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

**IT IS FURTHER ORDERED** that this case is set for a jury trial on **Monday, March 4, 2013 at 9:00 a.m.**


　　　　　　　　　　　　　　　　　<u>    /S/    David D. Noce    </u>
　　　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**



**Signed on January 14, 2013.**